COLE, Judge.
This case involves an oral contract to build a house. A major issue presented herein is whether the contract was a “flat-fee contract” or a “cost-plus contract.” Other issues involved are the reliability of various records, the accuracy of the figures used by the trial court in rendering judgment and the appropriateness of an award for certain remedial work and for future repairs.
Plaintiffs, Harriet Sipple Smith and her husband, G. Rogers Smith, contacted a local building contractor, defendant Clyde Ba-ham, concerning the construction of a large residence. The parties met sometime in December of 1977 and the Smiths informed Baham they wanted a house similar to the “Rathe house,” a residence Baham had constructed recently. The Smiths both testified Mr. Baham estimated he could build the house for approximately $25 a square foot. The Smiths stated further that at a second meeting a few weeks later, they presented Mr. Baham with preliminary plans and he told them he would build the house for a flat fee of $255,000. No written contract was executed.
To the contrary, Mr. Baham testified he never quoted a flat fee but instead informed the Smiths he would do the job on a “cost-plus” basis. He explained his usual method was to bill the owner for the labor, plus a 25% charge for insurance, overhead and taxes. To this figure he added the cost of material and then added a 15% charge on the entire amount for his profit.
In any event, the parties agreed Mr. Ba-ham would build the house and certain *1215 preparations began in March of 1978. Mr. Baham received the full set of plans sometime in May of 1978. The Smiths stated Baham assured them the house would be completed by December of that year.
Mrs. Smith testified there was no discussion as to how payments would be made. She described herself as “incredibly naive” and simply paid Mr. Baham at various intervals, in whatever amount he requested. It was not until well into the job she began asking him for invoices or records of where the money was going. She stated he gave her some invoices but they bore no relation to the amount she was paying him nor were the dates on the invoices coincidental with the dates of her payments.
As December of 1978 approached it became apparent the house was not near completion. Mrs. Smith testified there were many days when no workers showed up at the job site, in spite of her repeated pleas to Mr. Baham to proceed with the work. During the course of the project the Smiths made certain purchases directly from suppliers, buying lumber and an air conditioning system. They both testified they assumed they would be given a credit for these against the $255,000 flat fee.
Sometime in December of 1978 negotiations broke down between the parties, with the Smiths refusing to pay Baham and Ba-ham refusing to do any more work without being paid. In January of 1979, because they had to vacate their old house, the Smiths moved into the new house although it was not completed. In March the parties met in an attempt to reconcile their differences but to no avail.
The Smiths filed suit alleging Baham had failed to complete the contract and had caused them to spend more than the agreed upon price of $257,000.[1] Baham answered and filed a reconventional demand, alleging plaintiffs owed him $31,000 for material and labor.
After a protracted trial involving lengthy testimony and innumerable exhibits, the court found the contract had been a cost-plus contract and found “in most instances the plaintiff got full value for their expenditures on the house.” It concluded plaintiffs owed Baham $30,937 on the contract. It concluded further that because of Ba-ham’s defective workmanship the Smiths had to spend approximately $22,113.20 for repairs and would have to spend $24,445.96 for future repairs, a total of $46,559.16. The difference in the two awards and the amount finally awarded to the Smiths was $15,622.16. The Smiths, and then Baham, filed an appeal.[2]
We note at the outset the task of the trial court, and indeed, this court also, is almost an impossible one. It is virtually inconceivable the parties would have entered into a contract of this magnitude without a written agreement as to the rights and obligations between them. It is almost equally unbelievable the Smiths allowed the project to proceed for several months without asking for any verification as to where their money was being spent. The evidence submitted consisted of hundreds of cancelled checks, time sheets, invoices, etc. The parties operated on a “trust” basis through most of the construction with little or no documentation of the disbursement of funds. Yet because of the conflicts which arose, a suit was filed in which the trial court, some- 3 years after the construction took place, was expected to “straighten it all-out.” The reasoning of the trial court was valid and in light of the chaotic state of the exhibits, the end result was generally well-justified and supported by the evidence. There are, however, some mathematical problems which must be corrected.
Appellants’ first assignment of error is the trial court erred in concluding the contract was on a cost-plus, rather than a fixed fee, basis. The court addressed this issue as follows:
*1216 “The Court considers all litigants to be honorable people, and yet finds their testimony diametrically opposed. The Court can only look to the manner in which the construction was carried out to make a determination as to what type contract existed.
“In the early stages of construction, plaintiffs actually traveled around the area to obtain the best prices on materials. Materials were bought and paid for by the plaintiffs to the total tune of $116,321.99. This certainly does not support a position for a lock and key job.
“Further, in 1977-78, material prices were unstable and moving upward at a erratic rate. It is not logical that defendant agreed to a lock and key job on a house on which he had no detailed drawings and specifications, the construction of which would take at least one year, at a time when one did not know from day to day what materials would cost. It is therefore the finding of the Court that the parties agreed to a cost-plus contract as described by Mr. Baham for construction of the Smith residence.”
We agree with these conclusions and find the record supports the theory the contract was not entered into on a fixed fee basis.
Appellants contend further the trial court erred in accepting appellee’s records as reliable. As always, the trier of fact is granted a great deal of discretion when dealing with the credibility of witnesses and reliability of the evidence. The two records questioned by appellant are the “red book” in which Mrs. Baham accounted for all materials purchased for the Smith job, and the payroll sheets, which accounted for the labor expenses.
The red book contained hundreds of entries showing the date, the name of the supplier, the invoice number, and the type of material purchased. At the end of the red book Mrs. Baham totaled the expenses and entered a figure for “labor.” Although we find serious mathematical errors in the computation of the figures from the red book, we have no reason to disturb the trial court’s finding that the book is reliable in so far as it purports to represent materials purchased for the job.
Likewise, we find no error in the trial court’s acceptance of the payroll sheets as reliable evidence. Again, we have checked the computation of the figures ourselves in order to arrive at an accurate total spent on labor.
Before we discuss our findings as to the figures, we note the trial court found the parties had agreed to a cost-plus contract, “as described by Mr. Baham.” This arrangement, as heretofore stated, involved a labor fee, plus 25% for insurance, overhead and taxes, plus the cost of materials. To this figure was to be added a 15% fee for profit. At trial Mrs. Baham testified her calculation in the red book had not included the $116,321.99 paid by the Smiths directly to various suppliers for materials. Appellee argues this sum must be added into the formula and included when figuring the 15% profit.
The trial court apparently did not adjust the calculations found in the red book to include the $116,321.99 and we decline to do so here. We have no quarrel with Mr. Baham’s routine method of figuring his cost-plus contract. However, we note the typical situation would involve the contractor purchasing 100% of the materials himself. In the present case the homeowners purchased a substantial amount of the materials directly from suppliers, without any involvement on Baham’s part. Mrs. Smith testified some purchases were made pursuant to an agreement between the Smiths and Baham. Mr. Smith had some dealings with a lumber company and believed he could obtain better prices than Mr. Baham. The Smiths agreed to purchase the air conditioning system because Mr. Smith was knowledgeable about a heat pump and Mr. Baham was not. As the project progressed, it became necessary for the Smiths to pay certain suppliers because the suppliers delivered materials to the job site and demanded payment immediately.
*1217 Mr. Baham testified he had informed the Smiths he would charge them 15% on all materials, whether purchased by himself or by the Smiths. However, Mr. Baham admitted he never billed the Smiths for the 15% on these materials, although he did have a record of the Smith’s expenditures. He stated he intended to bill them but did not, due to the breakdown in the relationship.
We conclude the situation at hand is a deviation from the normal cost-plus contract because of the direct involvement of the owners in the purchasing of materials. We are not satisfied from the record that Mr. Baham proved there was any agreement between the parties these materials were subject to the 15% profit. Our conclusion is supported by the fact the final figures in the red book did not include this 15% charge and by the fact Mr. Baham never attempted to collect this fee from the Smiths. Absent proof of an agreement on this matter it would be unjust to allow Mr. Baham to tack on this profit as an afterthought.
We now examine the accuracy of the computation of figures on the payroll sheets in the red book.
In the grand total of figures, as Mrs. Baham transcribed them into the red book, is the sum of $93,056.37 for “labor.” We assume this includes the 25% fee for overhead, insurance and taxes. However when we added the items on the payroll sheets we arrived at these figures:
Labor.. $72,754.50
25% Pee- 18,188.62
Total Labor- $90,943.12
As pointed out by appellants, even if Mrs. Baham’s labor figure was correct, she made a serious error in addition in the red book. The trial court, apparently without checking the accuracy of the figures, relied upon them in granting Baham an award of $30,-937. To illustrate, we reproduce here the “grand total” as found in the red book.
Materials-$117,276.90
Labor-- 93,056.37
Total-$242,220.53 [3]
A simple addition check reveals the sum of these two figures is $210,333.27, which is $31,887.26 less than the amount computed by Mrs. Baham. After noticing this serious error we concluded we had no choice but to make an independent calculation of our own and therefore added every single entry in the red book to arrive at a final total of $114,070.44 for materials.[4]
Therefore, using the formula set forth by Mr. Baham (but deleting the amount paid by the Smiths directly to suppliers) we reached the following conclusion:
Total labor-$ 90,943.12
Materials- 114,070.44
Total Cost-$205,013.56
Plus 15% - 30,752.03
Total Due-$235,765.59
At trial the parties stipulated the Smiths had already paid to Baham a total of $214,-789.19 during the course of the construction. Therefore, the amount owed by the Smiths is $20,976.40 rather than the $30,-937.00 awarded by the trial court.
This amount was offset by the amount the trial court ordered Baham to pay the Smiths. The court found the Smiths had to pay another contractor, Stuart Holcombe, $55,283.16 to complete the residence. Mr. Holcomb testified approximately 40% of the work he did was remedial in nature, i.e., it was done to remedy problems created by Mr. Baham. He remedied certain problems with the floors and with several interior doors, among other things. Therefore the court ordered Ba-ham to pay 40% of the amount paid to Mr. Holcomb, or $22,113.20. We find this a reasonable conclusion.
*1218 In addition, the trial court awarded a total of $24,445.96 for future repairs to the upstairs fireplace, windows, doors, the front columns, and sheetrock in the kitchen and living room. We feel the necessity of these future repairs, as well as their approximate cost were well substantiated by the testimony of two experts, Peter Weg-man, an expert in millwork, and Gerald Collums, an expert in carpentry. Therefore, we will not disturb this award.
We conclude the Smiths owe Baham a total of $20,976.40 on the original agreement to build the house, and Baham owes the Smiths a total of $46,559.16 for remedial work and future repairs. The difference between these figures and the final amount owed by Baham to the Smiths is $25,582.76.
For the foregoing reasons, the judgment of the trial court in favor of plaintiffs and against defendant is increased from the sum of $15,622.16 to the sum of $25,582.76, together with legal interest thereon from the date of judicial demand, until paid, and in all other respects the judgment is affirmed.
All costs are to be paid by defendant, Clyde Baham.
AMENDED AND, AS AMENDED, AFFIRMED.

. Although the petition alleges the price was $257,000, plaintiffs testified at trial the price was $255,000.

. For reasons of simplicity we will refer to the Smiths as the appellants and to Baham as the appellee.

. The red book shows these figures (added incorrectly) and then lists various fees added to the cost by Baham. It then grants various credits to the Smiths for sums already paid and finally shows a balance of $30,937.

. The book contained several figures that were not entered in the usual column but were written off to the side. Because we found no explanation for these irregular entries, we did not include them in our computation.